RAYMOND GEIGER, APPELLEE, V. WILLIAM SWEENEY, APPELLEE, V. MODERN FARM SYSTEMS, INC., A CORPORATION, THIRD-PARTY DEFENDANT, APPELLANT, MONARCH INDUSTRIES, INC., A CORPORATION, THIRD-PARTY DEFENDANT, APPELLEE.

266 N. W. 2d 895

Filed June 14, 1978.   No. 41555.

David B. Smith for Smith & Smith, for appellant.

John Wightman for Wightman & Fallesen, for appellee Geiger.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

SPENCER, J.

This is an action based upon breach of an implied warranty of merchantability to recover damages for the destruction of a grain bin which was blown from its foundation by severe winds. The defendant seller filed a third-party complaint against the bin manufacturer and against the company which erected the bin. By stipulation and agreement the seller remained a party to the lawsuit only as a nominal defendant. From a jury verdict in favor of plaintiff and against the seller and the manufacturer, Modern Farm Systems, Inc. (hereinafter referred to as MFS), MFS appeals.

Defendant MFS sets out three numbered assignments of error. The first two are as follows: "1. A. The District Court erred in failing to instruct the jury that the Plaintiff had the burden of proof that the alleged breach of implied warranty was the proximate cause of Plaintiff's damages.

"B. The District Court erred in failing to instruct the jury on the definition of proximate cause, which was a material issue in the case.

"2. The District Court erred in instructing the jury by refusing the Defendant's instruction as to Act of God and in giving the Court's instruction as to Act of God."

For the reasons stated hereafter, we reverse.

The grain bin in question was manufactured by MFS. It was purchased by plaintiff from William Sweeney, who at the time was a dealer for MFS bins in Cozad, Nebraska. The contract price included the cost of erecting the bin, which was performed by Monarch Industries, Inc.

Monarch Industries, Inc., laid the concrete foundation for the bin in late summer or early fall of 1973. The bin itself was delivered to plaintiff's farm

and installed by Monarch Industries, Inc., in late October or early November of 1973. Plaintiff filled the bin half full of grain in November 1973. He completely emptied it in April 1974. While in this emptied condition, on May 9, 1974, the bin was lifted from its foundation during a storm and blown approximately 95 yards across a field. Plaintiff's expert measured the distance the bin traveled, and testified it had gone 140 feet through the air before hitting the ground and continuing to roll. The bin measured 36 feet in diameter, its height was approximately 21 feet to the eaves, and it weighed about 6 tons.

According to plaintiff's theory of the case, the grain bin contained a design defect in that the method used to anchor the bin to the foundation was insufficient to withstand strong winds. MFS defended on the ground that the bin's destruction was the result of an Act of God.

The first step in constructing a grain bin of this type is to pour a circular foundation. The construction manual furnished by MFS directs that the foundation for a 36-foot diameter bin should be 36 feet 9 inches in diameter. Thirty anchor bolts are set in the wet concrete around the perimeter of the foundation. The manual specifies that the anchor bolts should be 45½ inches apart and form a circle with a 36-foot 1¼ inch diameter. Thirty-one anchor bolts were actually used in the construction of plaintiff's bin.

The bin is assembled from the top down. The top row of curved, corrugated bin wall sheets is bolted together to form a ring. The roof sections are assembled and fastened to the top ring of the bin wall. The structure is then raised by a series of jacks and the next row of bin wall sheets is attached. This process continues until all the bin wall rings have been connected. At this point a base angle ring is attached to the bottom of the bin wall. The base

angle ring consists of several pieces of curved angle iron fitted together, with the flange pointing toward the outside of the ring. The manual instructs that base sealer should be applied to the bottom of the base angle while the bin is still suspended. It appears in this case that the mastic was applied after the bin was lowered and in position.

The bin is lowered inside the circle created by the anchor bolts. Clips are secured to each of the anchor bolts with a nut and washer, and are then clamped to the protruding lip of the base angle. The following drawing represents a cross-section of the anchor assemblage.

The clip is made of 10-gauge steel, and is approximately 4 inches long. It is flanged on two sides, so that viewed from the end it has an inverted U-shape. An elongated hole has been punched in the top for placement over the anchor bolt. The advantage of this type of anchor system over a direct bolt system, whereby a piece of metal is bolted directly to the bin wall and the anchor bolt, is that no alignment of holes is required. The distance between the bin wall and the anchor bolt can also vary since the clip can be slid back and forth. Properly installed, the clip should be as far forward as possible.

The disadvantage testified to at trial is that the clip tends to become loose. This may be caused by the base angle moving away from the clip because of wind or metal contraction. Alternatively, the base angle may move toward the clip because of wind or expansion caused by heat or the weight of grain stored inside the bin, wedging the clip loose.

Gerald Schmidt, vice president of Monarch Industries, Inc., testified that in his opinion the clip system was defective because the wind could blow the bin loose from the clips. He knew of at least 25 bins where clips had become detached. He did state that even with a direct bolt system the bolts should be checked and retightened twice a year, especially if the bin is left in an unloaded condition. However, he knew of only 3 of 2,000 to 3,000 of defendant's bins, besides plaintiff's, which had been destroyed. All three had been destroyed by tornadoes. Several other companies used the clip-type tie-down method used by MFS.

Plaintiff's expert, Marvin Laughlin of the Omaha Testing Lab, expressed the opinion that if there were a defect in design, it was that the bin was susceptible to improper installation. He conducted an inspection of the site on June 14, 1974, 5 weeks after the damage occurred. All the clips remained bolted to the foundation. A diagram showing the degree to

which the clips were bent and photographs showing the condition of the clips were received in evidence. This evidence demonstrates that the clips holding down the northeast side of the bin, the direction from which the wind came, received little if any damage. Most of the clips and anchor bolts around the remainder of the foundation were bent. This led plaintiff's expert to believe the force of the wind had pushed the bin horizontally out from under the clips on the northeast side. This eliminated the verticle hold-down force on that side and the bin was lifted from its foundation.

Laughlin also examined the position of the clips to see if they were properly installed. He determined that two of the clips on the northeast side, which he numbered 12 and 13, provided only minimal contact with the base angle. Clip No. 12 had been installed at a steeper angle than usual as its outside edge was imbedded in the concrete. In addition, the clip only overlapped about 50 percent of the base angle. Clip No. 13 only overlapped about 10 percent of the base angle. Laughlin determined that these clips had not moved, and made his measurements from the mastic which remained adhered to the foundation. He also found grain imbedded in the mastic in the area of clips Nos. 12 and 13, leading him to conclude there had been a gap underneath the base angle on the northeast side of the bin.

Gerald Schmidt disagreed with the assessment that clip No. 13 had not moved since it was installed. He pointed out that the photograph of the clip, exhibit 40, showed the tar had been stretched and the nut was not flush with the washer, indicating the clip had been pushed outward since it was installed. No verdict was returned against the installer so the jury verdict must be based on defective design.

No evidence was presented as to the wind velocity which would be required to lift a 6-ton bin from its foundation and carry it the distance testified to by

plaintiff's expert. MFS contends the wind must have been of tornadic force. It called as a witness Stella Etherton, who lived about a quarter of a mile from the grain bin. She testified there was a thunderstorm on the evening of May 9, 1974. It suddenly became very quiet and then "everything cut loose." The house shook and she could hear debris hitting the house. The noise and the wind stopped as quickly as it had started. The next morning she discovered a tree about 2 feet in diameter had been uprooted and carried 200 feet from the back of her house into the front yard. The roof of the grain bin was almost directly in front of her home. The grain bin was further north. It was squeezed so that it resembled a squeezed pop can. William Sweeney, who lived about 4 miles northwest of the grain bin, had an old cattle shed blown over the same evening. A 300-gallon fuel barrel on a metal stand was also toppled over near the grain bin. The fuel barrel belonged to plaintiff. He testified it was nearly empty.

The plaintiff made an inspection of the bin after it was completed. He did not observe anything incorrect about the construction. He noted that the bin "just looked like a grain bin." Plaintiff later observed the grain bin on at least five more occasions by walking around it. He had experienced no problems with it previous to its destruction.

This action was brought for the violation of an implied warranty of merchantability which is covered in section 2-314, U. C. C. Plaintiff relies specifically on paragraphs (a) and (c) of subsection (2), therein, which provide: "(2) Goods to be merchantable must be at least such as (a) pass without objection in the trade under the contract description; * * * (c) are fit for the ordinary purposes for which such goods are used; * * *."

At the instruction conference defendant MFS attempted to introduce the element of foreseeability into the instructions. Defendant argues that fore-

seeability forms an integral part of a definition of proximate cause, and is related to the definition of "proximate cause," and the definition of "merchantability." The latter definition was set out in instruction No. 11, but no definition of proximate cause was given.

The concept of merchantability must by definition include an element of foreseeability, for the reason that a merchant is required to know what will "(a) pass without objection in the trade" and must also know "(c) * * * the ordinary purposes for which such goods are used." Without the benefit of a definition of proximate cause of damage, which necessarily includes an element of foreseeability, the jury is left in the dark on a working knowledge of the elements necessary to determine liability.

White & Summers, in Handbook of the Law Under the Uniform Commercial Code, Hornbook Series (1972), § 9-6, p. 286, states: "A plaintiff in a merchantability lawsuit must prove that the defendant deviated from the standard of merchantability and that this deviation caused the plaintiff's injury both proximately and in fact. These necessities of proof make the merchantability case a first cousin to a negligence lawsuit. Under 2-314, a plaintiff must prove (1) that a merchant sold goods, (2) which were 'not merchantable' at the time of sale, and (3) injury and damages to the plaintiff or his property (4) caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury."

Comment 13 to section 2-314, U. C. C., states: "In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained."

The trial court gave the standard instruction on the burden of proof on an Act of God. It was as fol-

lows: "In connection with the assertion of all defendants that the sole proximate cause of the plaintiff's injuries, if any, was an Act of God, the burden is upon the defendants to prove by a preponderance of the evidence that the Act of God alleged was the sole proximate cause of the damage to the grain bin. If the defendants have failed to establish this proposition by a preponderance of the evidence, then you should disregard that defense in reaching your decision in this case.

"An Act of God is a manifestation of nature so unusual and extraordinary that it could not under normal conditions have been reasonably anticipated or expected."

We agree with the defendant, the District Court erred in failing to instruct the jury that plaintiff had the burden of proof that the alleged breach of implied warranty was the proximate cause of plaintiff's damages. The instruction given by the court on this point is as follows: "* * * the burden is upon the plaintiff to prove by a preponderance of the evidence, each and all of the following propositions * * * 4. That said defendant breached the implied warranty in that said bin collapsed and was destroyed by wind not too uncommon in the area. 5. That the breach of implied warranty caused the collapse of the bin and plaintiff suffered damages as the result thereof." It is only by inference that the jurors would know they must find that plaintiff's damage was caused proximately and in fact by the defective condition of the bin.

The trial court in its burden of proof instruction for MFS stated that MFS alleged the sole and proximate cause of plaintiff's injuries, if any, was an Act of God and that it had the burden to prove that assertion by a preponderance of the evidence.

As defendant alleges in its assignment of error, the trial court failed to give an instruction defining

proximate cause. One was required in this case. The failure to give it was prejudicial error.

We said in Danielsen v. Eickhoff, 159 Neb. 374, 66 N. W. 2d 913 (1954): "Proximate cause is a legal concept with a particular meaning in the law. It does not fall in that class of words or phrases where the meaning is commonly known and understood by the lay public. The purpose of the definition of the term is to keep jurors within correct legal bounds." We there held it was prejudicial error to use the term "proximate cause" without defining it. That case is controlling herein.

In Wagner v. Watson Bros. Transfer Co., 128 Neb. 535, 259 N. W. 373 (1935), we stated: "This court has held on numerous occasions that it becomes the duty of the trial court to instruct the jury upon the law of the case when made applicable by the pleadings and the evidence * * *. Clearly, it is one of the many functions of the trial court to present to the jury as clear and intelligent an understanding of the material issues presented by the pleadings and the evidence as lies within its power. The trial court, not having defined proximate cause, deprived the jury of an opportunity of considering that doctrine as one of the material issues of fact."

In instruction No. 4 on the third-party petition of Sweeney against MFS, the court instructed the jury that defendant Sweeney was required to prove "4. That said defendant, Modern Farm Systems, Inc. breached the implied warranty, in that said bin was improperly designed, which said design caused the bin to be blown away in a wind not uncommon in the area." Counsel for MFS at the instruction conference objected to the wording "be blown away in a wind not uncommon in the area" as confusing, in view of the Act of God instruction, because tornadoes are common in Nebraska. The use of the words in context could lead the jury to consider a grain bin which could not withstand a tornado to be

unmerchantable. Defendant's counsel suggested the words "which could be guarded against" be added to paragraph 4 of the instruction. This was not done, but he did not pursue it further.

Counsel for MFS submitted an Act of God instruction which would have amended the last sentence of the instruction given to read "An Act of God is such an unusual and extraordinary manifestation of the forces of nature that it could not under normal conditions have been anticipated or expected or guarded against or resisted, and no ordinary and reasonable amount of care would have prevented the damage."

Under the instructions given, the jury could have found that if MFS breached its warranty of merchantability the plaintiff could recover, although a tornado would have caused the same damage if there had not been a breach of warranty.

In view of the decision we have reached, it is unnecessary to consider other assignments of error. The defendant, Monarch Industries, Inc., was released as a defendant by the judgment of the jury. Neither of the parties has cross-appealed as to that portion of the judgment. The judgment as to the defendants William Sweeney and Modern Farm Systems, Inc., is reversed and the cause is remanded for a new trial as to them.

REVERSED AND REMANDED.